UNITED STATES vs COHN.

Opinion Delivered June 13, 1899.

*1. Liquor Law—Power of Congress to enact.*

Congress, in the exercise of the police power of the government, has full power to prohibit the sale in the Indian Territory of malt and fermented liquor, whether intoxicating or not.

*2. Statutory Construction—Rule.*

The courts are not bound to follow the exact grammatical construction of the language of a statute. If by other methods it can be determined what the legislative body intended, the court will give such construction to the statute as it may find actually intended.

*3.   Prohibited Liquor—Not necessary to be intoxicating.*

The act of May 2, 1895, as well as the act of January 30, 1897
prohibited the introduction, manufacture, or sale of all malt
or fermented liquor, when to be used as a beverage or for
drinking, regardless of whether they are intoxicating or not.

TOWNSEND, J., dissents.

Appeal from the United States Court for the Northern
District.

WILLIAM M. SPRINGER, Judge.

The defendant, Louis Cohn, was indicted for selling
malt liquors in the Indian Territory.    There was a verdict
of acquittal.    The plaintiff appeals.    Reversed.

This is a criminal action brought in the Northern dis-
trict of the Indian Territory by the United States, by its
attorney, Pliny L. Soper, Esq., against Louis Cohn, the
appellee, upon an indictment, sufficient in form and regularly
found and presented, charging the defendant in four counts,
with having (1) introduced and carried into the Northern
district of the Indian Territory one quart of vinous liquor,
one quart of malt liquor, one quart of fermented liquor, and
one quart of intoxicating drink; (2) that he procured the
introduction of the above named liquors; (3) that he did sell,
in the said Northern district of the Indian Territory, to one
L. S. Banks, the aforesaid liquors; (4) that he did then and
there sell the aforesaid liquors to one John M. Taylor, Jr.,
a Cherokee Indian under the charge of an Indian agent,—all
contrary to the form of the statutes in such cases made and
provided, and against the peace and dignity of the United
States of America.

At the trial the defendant admitted before the jury as
follows:   "It is admitted by the defendant, for the purpose

of this trial only, that on the 1st day of November, A. D. 1897, he introduced one quart of malt liquor into the Northern district of the Indian Territory, which said malt liquor is known and designated as 'Rochester Tonic,' and is manufactured by the J. D. Iler Brewing Co,, of Kansas City, Mo. It is further admitted by the defendant that the said brewing company pays to the government of the United States the same revenue tax upon this Rochester Tonic as it pays to the government of the United States upon beer. It is further admitted by the defendant that about the first day of December, A. D. 1897, within the Northern district of the Indian Territory, and within the jurisdiction of this court, he sold one quart of the said Rochester tonic, a malt liquor, to one L. S. Banks, a white man, and a citizen of the United States, and that on or about the same date he sold, within the Northern district of the Indian Territory, and within the jurisdiction of this court, one quart of Rochester Tonic, a malt liquor, to one John M. Taylor, a member of the Cherokee Indian Nation by blood, and a citizen thereof.'' And Mr. Soper, the United States attorney, admitted that the laws of the United States require the imposition and collection of a revenue tax upon all malt liquors, without regard to the amount of alcohol contained therein, or the amount of malt.

Besides these admissions, there was one witness placed upon the stand. His name was Adam Hammann, and he called himself the ''brew master of the J. D. Iler Brewing Company, of Kansas City, Mo ,'' the brewery at which the liquor mentioned, in the indictment was brewed. As the testimony of this man is short and important, as well as entertaining, we will insert it all.

''Question. What is your name? Answer. Adam Hammann. Q. Where do you reside? A. Kansas City. Q. Missouri? A. Yes, sir. Q. What is your occupation? A.

A brewer. Q. By whom were you employed in October and November, A. D. 1897, and by whom at the present time? A. J. D. Iler Brewing Company, of Kansas City, Missouri. Q. Is there any other name under which the brewing company goes? A. Not that I know of. Q. Is it not also called the Rochester Brewing Company? A. That is a by-name. Q. Just a nickname? A. Yes, sir. Q. Did not the J. D. Iler Brewing Company go by the name of the Rochester Brewing Company? A. Yes, sir; it did once. Q. In what capacity are you employed by the J. D. Iler Brewing Company of Kansas City, Missouri? A. As brew master. Q. Are you acquainted with the process of the manufacture of a liquor known as 'Rochester Tonic'? A. Yes; I know about it. Q. Please describe to the jury how Rochester Tonic is manufactured, and of what it consists. A. Rochester Tonic is made from malt, and we put in about three per cent of extract and 1 75-100 per cent. alcohol. Q. Tell exactly how it is manufactured. A. It is made into a mash. Q. What is done with the mash? A. We make it into Rochester Tonic; put it in a kettle and boil it until we get a certain percentage,—what we want. Q. Is it not a matter of fact, Mr. Hammann, that Rochester Tonic is the second draw or brew from the mash from which you had previously made beer? A. Yes, sir; the second. Q. You boil it and make it weaker, and make it into Rochester Tonic? A. Yes, sir. Q. Then, as I understand it, it is simply beer with a less per cent. of alcohol than is contained in ordinary beer? A. Yes, sir. Q. The mash has been reduced in strength? A. Yes, sir. Q. Does not this percentage vary? A. No. Q. How do you test it? Do you test it from a single brew, as to the percentage of alcohol in each brew of this Rochester Tonic? A. Yes, sir; I do that. I analyze it with an apparatus. Q. In what respect does Rochester Tonic differ or vary with what was known as 'Malt Ale,'—with Malt Ale that you put up and shipped into the Indian Territory in June, 1897? A.

Well, we made Malt Ale and shipped it everywhere. Q. How does it differ from your Malt Ale,—the ''ochester Tonic from the Malt Ale? A. Well it is pretty nearly the same. Q. Simply change the name from 'Malt Ale' to 'Rochester Tonic'? A. It is a little weaker in alcohol. Q. Rochester Tonic? A. Yes, sir; Malt Ale had about $2\frac{1}{2}$ per cent. Q. Is it not a matter of fact that your Malt Ale contained as high as 3 940-1000 per cent. of alcohol? A. I can't say that. Q. Will you swear that none of your Malt Ale contained 3 940-1000 per cent. of alcohol? A. I cannot swear to it except as I analyze it myself. Q. Now, in what does this differ from your Vegetable Tonic? Do you not manufacture what you call 'Vegetable Tonic'? A. No; I know nothing about it. Q. Liquor known as 'Vegetable Tonic'? A No, sir. Q. Before this malt liquor is run into vats, and from the vats bottled, is it always tested as to its percentage of alcohol? A. Yes, sir. Q. And is that percentage always uniform,—the same? A. It changes a little,—about 5-10 of one per cent., maybe 3-10, maybe less. Q. Maybe more? A. Maybe less, too. Q. In other words, you can't get it to scale just what you want it; you come to it by about 2-10 to 3-10? A. Yes, sir. "

Cross-examination: "Q. Is this Rochester Tonic intoxicating? A. No. Q. I will ask you, Mr. Hammann, if you ever had much experience in a brewery? A. Yes, sir. Q. For how many years?. A. About 19 years. Q. I believe that you are acquainted with the per cent. necessary to intoxicate, are you not? A. Yes, I guess. Q. Are You? A. Yes, sir. Q. What is the universal opinion among brewers as to the quantity necessary to intoxicate? A. Yes, sir. Q. I will ask you, Mr. Hammann, whether or not it is a fact recognized by all brewers and scientists on the subject of manufacture and brewing of articles that all goods containing two per cent and less of alcohol are not intoxicating? A. No, sir. The Court: Q. What is your experience. as an

expert, that goods containing two per cent. or less of alcohol will intoxicate?  What is the fact as to whether liquors containing two per cent. and under of alcohol will intoxicate or not? A. No. Q. Will not? A. No. Q. That is your experience as an expert.  An 'expert' is one that knows about a particular subject or business.  You have been 19 years a brewer. That makes you what we call an 'expert,'—one capable of giving an opinion, as distinguished from one who can testify as to facts only.  You can give your opinion as to what percentage of alcohol in liquors is necessary to make these liquors intoxicating.  A. Not over two per cent.  Q. You mean that if it contains two per cent., or under that, it will not intoxicate?  A. It is not.  Q. Where is the line?  A. No line on it above.  Q. You simply reach the conclusion that two per cent of alcohol will not intoxicate.  Is that right? A. No.  Q. Mr. Harkless:  Mr. Hammann, if there is only two per cent. intoxicants or alcohol in beer, it is not intoxicating, is it?  A. No, sir.  Q. Mr. Soper:  Why won't it intoxicate?  A. It contains not over two per cent in alcohol. Q.  Why won't that two per cent of alcohol intoxicate some people?  I will admit that two per cent won't intoxicate you, or I either.  Why won't it intoxicate a man not accustomed to the use of intoxicants?  A. What I know is that two per cent. is law,—it is not intoxicating.  Q. The Court: How do you find that out?  A. Revenue office  Q. what is the rule in the revenue office?  A. The rule is that not over two per cent can go to the Indian Territory.  Q. Mr. Soper: That is the law that you made up at the brewery, or your attorneys made for you? A. No, sir.  Q. The court: How do you know that liquor which has only two per cent. of alcohol will not intoxicate a person who drinks it?  A. It is too weak.  Q. In what?  A. Alcohol.  Q. How do you know that?  A. Experimenting.  Q  What experimenting have you carried on yourself,—what have you done to experiment?  A. What I know is that it is too weak to make a

man drunk. Q. How do you know that? By trying it on other people? A. I did try it on other people, and never saw a man drunk from that. Q. Have you any way of finding out how much alcohol in malt liquor is required to make it intoxicating? Have you any way of finding that out? A. Yes, sir; apparatus. Q. Find out how much alcohol by the apparatus? A. Yes, sir. Q. How do you tell what amount of alcohol will make a person drunk who drinks the beer or malt liquor? How do you find that out? A. If you drink it, you find out. Q. Mr. Harkless: I will ask you if it is not generally known among all brew masters and scientists that that per cent. will not intoxicate; generally understood that it will not? A. Yes, sir. The Court: It is conceded in argument that beverages containing two per cent. and under of alcohol will not intoxicate, and of this fact the court will take judicial notice."

*P. L. Soper*, for appellant.

1.   All laws which apply to the Indian country within any portion of the United States, apply equally as well to the Indian Territory, unless the general statutes have been repealed, abridged, or modified by special action, relating to the Indian Territory alone. Rev. St. U. S. § 2139, as amended by act of July 23, 1892, applied to the Indian Territory, until enactment of the act of March 1, 1895, 28 Stat at L. 694. A proper construction of this act prohibits the sale of all malt, vinous, or fermented liquor within the Indian Territory, whether intoxicating or not. The phrase "Or any other intoxicating drinks of any kind whatsoever" does not limit the prohibition to such malt liquors as are intoxicating.  A penal statute should be construed to carry out the obvious intention of the legislative body. Kent. Com. 461. The intent of the whole act should control, Suth. Stat. Con. § 240; Alexander vs Worthington, 5 Md.

485. The legislature must be understood to mean what it has plainly expressed. Green vs Weller, 32 Miss. 650; Rogers vs Rogers, 3 Wind. 503; Raynolds vs Holland, 35 Ark. 56. When general words follow particular and specific words, the former must be confined to the things of the same kind. Suth. Stat. Con. §§ 268, 269; in re, Wigert, 119 Ill. 83, 1 Wilb. St. 184; Foster vs Blount, 18 Ala 687.

2. A beverage containing alcohol, is an intoxicant, regardless of whether the quantity of alcohol contained in it is of itself intoxicating. Black, Intox. Liql, page 18; State vs Wordsworth, 30 Conn. 55.

*Maxey, Clayton & Martin and Harkless, O'Grady & Crysler* for appellee.

The act of January 30, 1897 does not apply to the Indian Territory. The act of March 1, 1895, is still in force and is not repealed or amended in any way by the act of 1897. Suth. Stat. Const. §§ 157, 158, 159; Manker vs Faulhaber, 94 Mo. 430; Sedg. on Stat. Const. (2nd Ed.) pages 97-107; Ex parte Smith, 40 Cal 419; State vs Stoll, 17 Wall. 425; Mayor vs Minor, 70 Ga. 191; Ex parte Crow Dog, 109 U. S. 556; McKenney vs Edmundton, 91 N. Y. 231; State vs Sturgess, 10 Oregon 58; Covington vs East St. Louis, 78 Ill. 548; Adams vs Owensboro, 85 Kentucky, 265; State vs Judge of St. Louis, 38 Mo. 529; Fosdick vs Perrysburg, 14 Ohio State 472; Burt vs Jeffries, 14 Iowa 494. If the comparison of one clause with the rest of the statute makes a certain proposition clear and undoubted, the act must be construed accordingly and ought to be so construed as to make it a consistent whole: Suth. on Stat. Const. §§ 239, 240; San Diego vs Gramriss, 77 Cal. 511; Miller vs State, 106 Ind. 423, 424; Intoxicating Liquor Cases, 25 Kans. 751; Electro Co. vs Van Auken, 11 Pac. 80; McDade vs People, 29 Mich. 52; Brooks vs Cook, 44 Mich. 619; Macunder vs White

(31)

River, 52 Mich. 197; State ex rel vs Fisher, 119 Mo. 35 :; Kane vs K. C., Ft. S. & M. Ry. Co., 112 Mo. 34. Compounds of liquor, or other ingrediences, such as bitters alcohol and drinks are not prohibited by a statute against intoxicating liquor, although they may contain alcohol, unless they are intoxicating. 25 Kans. 751.

CLAYTON, J. The determination of the questions raised in the case depend solely upon the coustruction to be given to section 8 of an act of congress approved March 1, 1895, entitled "An act to provide for the appointment of additional judges of the United States court in the Indian Territory, and for other purposes." 28 Stat. 697. It is as follows: "That any person, whether an Indian or otherwise, who shall, in said territory, manufacture, sell, give away, or in any manner, or by any means furnish to any one, either for himself or any other, any vinous, malt or fermented liquors, or any other intoxicating drinks of any kind whatsoever, whether medicated or not, or who shall carry, or in any manner have carried into said territory, any such liquors or drinks, or shall be interested in such manufacture, sale, giving away, furnishing to any one, or carrying into said territory any such liquors or drinks, shall, upon conviction thereof, be punished by fine not exceeding five hundred dollars, and by imprisonment for not less than one month nor more than five years."

It is contended by the learned counsel for defendant (1) that, notwithstanding the fact that the liquor in question was a "malt liquor," yet, because it was not shown to have been an "intoxicating drink," it is not prohibited by the statute; and (2) that, not being intoxicating, it is a harmless beverage, and therefore congress would have no constitutional power to discriminate against it, and prohibit its introduction and sale into and upon its Indian reservations. We will first consider the constitutional objection.

If the Indian Territory were a state of the Union, the contention might be maintained upon the ground that it would be in violation of that provision of article 8 of the constitution of the United States, which grants to congress the power to regulate commerce with foreign nations and among the several states. But, however long may have been the strides recently taken by the United States government towards opening up this country, it is yet but an Indian reservation, and whatever powers congress may have under the constitution relating to any of the other Idian reservations it has as relating to this. This territory is without municipal government. As far as the United States is concerned, it is absolutely and exclusively controlled by its courts and its officers, and an Indian agent acting under the direction and control of the interior department. A few deputy marshals and Indian police are depended upon to keep the peace and maintain the good order of the country. There are many towns of respectable size without a peace officer in them. All of the land is owned by Indians, and, besides being occupied by the five more civilized tribes, it is the home of some six or eight others. White men have entered the territory, so that the population has become quite dense. Some of these Indian governments, by acts of congress, have recently been stripped of every vestige of power to keep the peace and enforce the laws. Under these conditions we submit that the police powers of the federal government, and its power to regulate commerce with the Indian tribes, granted by section 8, art. 1, of the constitution of the United States, should be liberally construed. The quesion is, has congress the constitutional power to prohibit the introduction and sale to either white man or Indian, on Indian reservations, of malt liquors, notwithstanding the fact that the proof before a jury may show that it is not intoxicating? No constitutional provision has been pointed out to us prohibiting the exercise by congress of

this power. Here the sovereignty of the United States is full, complete, and undivided. Whatever the federal and state legislatures combined may do in a state, the federal congress alone may do here. All of the police powers exercised by the states in their jurisdictions is exercised by the federal government in this jurisdiction. The states, in the exercise of this power, sometimes find themselvs hampered by provisions of the federal constitution,—especially that of article 1, § 8, which grants to congress alone the right to regulate commerce with foreign nations, among the states, and with the Indian tribes; but, inasmuch as that power is given to congress, no such impediment lies in the way of its full exercise of its police powers here. In the exercise of this power it is only circumscribed by the provisions of the constitution, and the higer law of nature affecting the common rights of men. We think that it cannot be successfully maintained that the defendant in this case had the inalienable right to introduce into an Indian resererervation, and there sell to Indians, a weak character of lager beer, manufactured from malt, containing 2 per cent. of alcohol, to be used as a beverage. In the discussion of this case it must be borne in mind that the statute in question is an act of congress relating .to Indian reservations, emanating from a sovereignty with full power to regulate commerce with the Indian tribes, and exercising over this territory the fullest and amplest police powers that can be vested in a government. The relations which these Indians, for whose benefit the statute was largely enacted, sustain to the United States government, must also be remembered. The supreme court of the United States has frequently designated them as the "wards of a nation," which has always exercised the fullest control over them. By solemn treaty, still in full force, it has obligated itself to protect them from the evil influences of intoxicating liquor, by absolutely prohibit-

ing its introduction and sale upon their reservations. 14 Stat. 806.

The learned counsel for defendant contend that congress is without the constitutional power to prohibit the introduction and sale in the Indian country of any article, upon any pretense, if it can be shown that such article is one of commerce, and is in itself innocent; and in support of this view we are cited to the case of Schollenberger vs Pennsylvania (decided by the supreme court of the United States May 23, 1899) 18 Sup. Ct. 757. In that case the defendant was indicted and convicted for the violation of a statute of Pennsylvania prohibiting the manufacture and sale of oleomargarine in that state. A Rhode Island company engaged in the manufacture and sale of that commodity had shipped to its agent in Philadelphia, the defendant in that case, a quantity, to be there sold. The defendant, as such agent, in violation of the Pennsylvania statute proceeded to sell the article in original packages, for which act he was tried and convicted. The supreme court of the United States, in passing on the constitutionality of the statute, found: First, that oleomargarine was an article of commerce; and, second, that it was healthful,—and announced the following rule of law applicable to such cases: "The general rule to be deduced from the decisions of this court is that a lawful article of commerce cannot be wholly excluded from importation into a state from another state where it was manufactured or grown. A state has power to regulate the introduction of any article, including a food product, so as to insure purity of the article imported, but such police power does not include the total exclusion even of an article of food." And the court, in announcing its decision, says: "The act of the legislature of Pennsylvania under consideration, to the extent that it prohibits the introduction of oleomargarine from another state, and its sale in the original package, as described in the special verdict, is invalid." This decision

rests wholly upon the ground that to the extent named the
statute of Pennsylvania was an invasion of the powers which
belonged alone to congress. But suppose that power had
not been conferred on congress by the constitution, and it
had been left as a part of the power retained by the states;
does any one doubt, under such circumstances, in the light
of the above decision, but that the statute would have been
held constitutional, and its enforcement within the soverign
power of these governments? In such a case, what consti-
tutional provision would have been violated, or what natural
right would have been denied? And the federal govern-
ment, over its unorganized territories, and, by express pro-
vision of the constitution, over its Indian reservations, has
that full sovereignty. The statute of Pennsylvania, by the
above decision, is invalid only because it violates a provision
of the federal constitution. The statute under consideration
in this case was enacted by congress under the same provis-
ion of that instrument. But this provision gave to congress
the very power which it denied to the commonwealth of
Pennsylvania, and for the want of which alone the Pennsyl-
vania statute was declared to be invalid. In the case of
Powell vs Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 1257,
the supreme court of the United States held this very stat-
ute to be constitutional, as to oleomargarine manufactured
and sold within the state of Pennsylvania. In that case, of
course, the question of commerce among the states was not
involved, because the article was wholly manufacutred and
sold within the state. It was contended, however, that the
statute was in violation of the fourteenth amendment to the
constitution. In that case it was admitted, for the purposes
of the trial, that on the day named in the indictment the de-
fendant had sold to the prosecuting witness, as an article of
food, two original packages of oleomargarine butter, de-
scribed in the indictment, and that he also had in his posses-
sion a large amount of the same article, with the intent to

sell the same as an article of food. The defendant then offered to prove by one Prof.' Hugo Blanck that he saw manufactured the article sold to the prosecuting witness; that it was made from pure animal fats; that the process of manufacture was clean and wholesome, the article containing the same elements as dairy butter, the only difference between them being that the manufactured article contained a smaller proportion of the fatty substance known as "butterine"; that this butterine existed in dairy butter in the proportion of from 3 to 7 per cent., and in the manufactured article in a smaller proportion, and was increased in the latter by the introduction of milk and cream; that, this having been done, the article contained all the elements of butter produced from pure unadulterated milk, or cream from the same, except that the percentage of butterine was slightly smaller; that the only effect of butterine was to give flavor to the butter, and that it had nothing to do with its wholesomeness; that the oleaginous substances in the manufactured article were substantially identical with those produced from milk or cream; and that the article sold to the prosecuting witness was a wholesome and nutritious article of food,— in all respects as wholesome as butter produced from pure unadulterated milk, or cream from unadulterated milk. The defendant also offered to prove that he was engaged in the grocery and provision business in the city of Harrisburg, and that the article sold by him was part of a large and valuable quantity manufactured prior to the 21st of May, 1885, in accordance with the laws of the commonwealth of Pennsylvania relating to the manufacture and sale of said article, and so sold by him; that, for the purpose of prosecuting that business, large investments were made by him in the purchase of suitable real estate, in the erection of proper buildings, and in the purchase of the necessary machinery and ingredients; that in his traffic in said article he made large profits, and, if prevented from

continuing it, the value of his property employed therein would be entirely lost, and he be deprived of the means of livelihood. To each offer the commonwealth objected upon the ground that the evidence proposed to be introduced was immaterial and irrelevant. The purpose of these offers of proof was avowed to be (1) to show that the article sold was a new invention, not an adulteration of dairy products, nor injurious to the public health, but wholesome and nutritious as an article of food, and that its manufacture and sale were in conformity to the acts of May 22, 1878, and May 24, 1883; (2) to show that the statute was unconstitutional, as not a lawful exercise of the police power, and also because it deprived the defendant of the lawful use "of his property, liberty, and faculties, and destroys his property, without making compensation." The court sustained the objection to each offer, and excluded the evidence. An exception to that ruling was duly taken by the defendant. The defendant was convicted, and the judgment of the court was affirmed by the supreme court of the state. The supreme court of the United States, in affirming the judgment of the supreme court of Pennsylvania, held: "A statute which is a legitimate exercise of the police power of the state for the protection of the health of the people, and for the prevention of fraud, is not inconsistent with the fourteenth amendment to the constitution of the United States That amendment was not designed to interfere with the exercise of the police power by the states. Whether the manufacture of oleomargarine, or imitation butter, involves such danger to the public health as to require its entire suppression, rather than its regulation in such a manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, is a question of fact and of public policy, which belongs to the legislative department to determine. The legislative determination of such questions is conclusive upon the courts, unless it appears upon the face

of the statute, or from facts of which the court must take judicial cognizance, that the statute infringes rights secured by the fundamental law. Although legislation on this subject may be unwise, or unnecessarily oppressive to those manufacturing and selling wholesome oleomargarines as an article of food, yet the courts cannot interfere without usurping powers committed to another department of government. The appeal must be to the legislature or to the ballot box, not to the judiciary The judiciary department is bound not to give effect to statutory enactments which are plainly forbidden by the constitution. If the incompatibility of the constitution and the statute is clear and palpable, the courts must give effect to the former. The Pennsylvania statute of May 21st, 1885, to prevent adulteration of dairy products, etc., is not repugnant to the clause of the four teenth amendment forbidding the denial by the state to any person of the equal protection of the laws, nor as depriving any person of his property without just compensation, and is valid '' In arriving at these conclusions, among other things, the court say: ''Whether the manufacture of oleo-margarine, or imitation butter, of the kind described in the statute, is or may be conducted in such a way, or with such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such a manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and public policy, which belong to the legislative department to determine. And as it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determina tion of these questions is conclusive upon the courts. It is not a part of their functions to conduct investigations of

fact entering into questions of public policy, merely, and to
sustain or frustrate the legislative will, embodied in stat-
utes, as they may happen to approve or disapprove its
determination of such questions.    The power which the leg-
islature has to promote the general welfare is very great,
and the discretion which that department of the government
has in the employment of means to that end is very large.''
The same doctrine is held by the supreme court of the
United States in the case of Plumly vs Massachusetts, 155
U. S. 461, 15 Sup. Ct. 154; Mugler vs Kansas, 123 U. S. 623,
8 Sup. Ct. 273; Leisy vs Hardin, 135 U. S. 100, 10 Sup. Ct.
681; and numerous other cases hereinafter cited.    And the
supreme court of the United States has never gone further
than to hold that such state statutes are unconstitutional or
invalid only when they exclude the manufactured article
from being introduced from other states, and sold in the
original package.

The rules to be deduced from the decisions of the
supreme court of the United States relating to such statutes
seem to be as follows:   (1) The legislatures of states, acting
upon subjects fairly within the scope of their police powers,
may forbid the manufacture and sale of articles relating to
those subjects within the limits of the state, although it
may be shown that the particular article is healthful and
harmless.    (2) When the subject of legislation is within the
police power of the state, unless the manufactured article
be so palpably harmless as that courts will take judicial
notice of that fact, or it shall appear on the face of the stat-
ute, the question as to whether the prohibited article be
pernicious or harmless is a matter of public policy, which
belongs to the legislative department to determine, and the
action of the legislature is conclusive on the courts.    So no
proof on that subject can be admitted in evidence.    (3)
That, if the prohibited article shall have been recognized by
the federal government as an article of commerce, the state

cannot prohibit its introduction and sale in original packages without an enabling act of congress.

It is clear that whatever statutes legislatures of states may lawfully enact, in the exercise of their police powers, within the limits of the states, congress may enact within the limits of the territories over which it has exclusive jurisdiction. It is equally as clear that, if these statutes which state legislatures enact, to be operative within the limits of the states, are not in conflict with the fourteenth amendment to the constitution, the same statutes, if enacted by congress, to be operative within the limits of territories over which it has exclusive jurisdiction, would not be in conflict with the fifth amendment to the constitution. And it is also obvious that the question of interstate commerce has nothing to do with the determination of the questions we are now discussing, because there are no limitations in the constitution upon congress in relation to this, but, on the contrary, that instrument grants to it full and exclusive power to regulate commerce among the states and with the Indian tribes.

Was the subject of the statute under consideration fairly within the police power of the federal government? The subject of legislation was the introduction and sale of intoxicating liquors in the Indian country,—a territory occupied and set apart for Indian tribes, and owned exclusively by them, and wholly within the exclusive jurisdiction of congress. There is no article, the right of the state to control or prohibit the sale or manufacture of, which, within its limits, is better established than spirituous and alcoholic liquors. License Cases, 5 How. 504; Downham vs Alexandria, Council, 10 Wall. 173; Bartemeyer vs Iowa, 18 Wall. 129; Boston ¹ eer Co. vs Massachusetts, 97 U. S. 25; Tiernan vs Rinker, 102 U. S. 123; Foster vs Kansas, 112 U. S. 201, 5 Sup. Ct. 8, 97; Mugler vs Kansas, 123 U. S. 623,

8 Sup. Ct. 273; Kidd vs Pearson, 128 U. S. 1, 9 Sup. Ct. 1; Eilenbecker vs District Court of Plymouth Co., 134 U. S. 31, 10 Sup. Ct. 424; Leisy vs Hardin, 135 U. S. 100, 10 Sup. Ct. 681. But it is said that all malt liquor is not intoxicating. Yet, if it be admitted that some of it is, it brings the subject within the police power of the government, and within the rule that all may be prohibited. There is none can be made but has some proportion of alcohol in it. Webster's International Dictionary defines malt to be ''barley or other grain steeped in water, and dried in a kiln, thus forcing germination until the saccharine principle has been evolved. It is used in brewing and in distillation of whiskey." The same authority defines malt liquor to be "an alcoholic liquor, as beer, ale, porter, etc., prepared by fermenting an infusion of malt." Webster's Unabridged Dictionary defines alcohol to be "pure or highly rectified spirits, extracted by simple distillation from various vegetable juices and infusion of a saccharine nature, which have undergone vinous fermentation; the spirituous or intoxicating element of fermented liquor." And thus it will be seen that the very object of reducing grain to malt, and malt to mash, and mash to the process of fermentation, is to infuse into the liquid the alcoholic or intoxicating principle that nature has locked up in the grain. All malt liquors are therefore alcoholic. And the beer sold by the defendant in this case is admitted to be a malt liquor. We therefore hold that congress, in the exercise of the police power of the government, had full power to prohibit the introduction and sale in this territory of malt and fermented liquors in all of their forms.

*Police Power of Congress.*

And this brings us to a consideration of the other branch of this case, to-wit, has congress, by the statute under consideration, prohibited the introduction and sale in this territory of all malt liquors, or only such as may be proven to be intoxicating. The statute provides "that any

person, whether an Indian or otherwise, who shall, in this territory, manufacture, sell, give away, or in any manner or by any means furnish to any one, either for himself or another, any vinous, malt, or fermented liquors, or any other intoxicating drinks of any kind whatsoever, whether medicated or not, or who shall carry or in any manner have carried into said territory any such liquors or drinks, or who shall be interested in such manufacture, sale, giving away, furnishing to any one, or carrying into said territory, any of such liquors or drinks, shall, upon conviction, be punished," etc. No one can carefully read this statute, but that he will be impressed with the idea that congress, whatever it omitted to do, intended to completely cover the whole case, and to erect a complete and impregnable barrier against the introduction, sale, and use of intoxicating liquor in all of its forms, and to guard against all of the well-known subterfuges resorted to to deceive courts and juries in relation to the matter; and, if congress has failed in this, it is only because of the use of the word "other" in the statute. It is contended by the learned counsel for the defendant that the words "any other intoxicating drinks," used after the language prohibiting the manufacture, sale, giving away, etc., of any vinous, malt, or fermented liquors, are to be taken as words limiting and explaining the meaning of those words which precede them to be that the articles thus named are intoxicating also. We think that this is not necessarily the only construction that can be given to the words. We have already seen that the legislature, in the exercise of the police powers of the government, may, acting upon a subject within its powers, designate even a harmless article as being hurtful, and that such designation is binding on the courts. So in this case we think that the statute is subject to the construction that congress intended to say that vinous, malt, and fermented liquors were intoxicating, and then, because a large class of intoxicants, such

as whiskies, brandies, gin, and all other ardent and spiritu-
ous liquors had not been named in the statute, the words
"all other intoxicating liquors" were intended to cover them.
And, whatever may be the exact grammatical construction
of the language, courts are not always bound to follow it.
If, by other methods allowed by the law, it can be deter-
mined that congress otherwise intended, the court will give
such construction to the statute as by lawful methods it may
find congress actually intended. The intent of the statute
is law.

*Statutory.
Construction.*

It will be seen that the only kinds of liquors specific-
ally named by the statute are vinous, malt, and fermented
liquors. If it were intended that only such of these as could
be shown to be intoxicating should be included, why name
them at all? Why not simply say that all intoxicating
liquors and drinks should be prohibited, or whiskey, brandy,
rum, wines, and all other intoxicating drinks? The more
common use of language in such cases is to name the more
pronounced articles first, and then follow them with the
general clause, and thus emphasize that which is intended.
Whiskey, brandy, rum and wines are all intoxicating per se.
Therefore name them, and then all that it may be necessary
to prove to be intoxicating naturally come under the general
clause "all other intoxicating drinks." But here those more
intense intoxicants are not named at all, but vinous, malt,
and fermented liquors are. Congress evidently had some
purpose in thus changing the ordinary and common use of
language, and what other purpose could it have had, but to
declare the fact that these alcoholic drinks were taken to be
intoxicating. Then the words "other intoxicating drinks"
naturally and grammatically perform their office in the sen-
tence. The subject-matter of congressional legislation was
intoxicating liquors, and vinous, malt, and fermented liq-
uors are therefore named as such. It will be presently
shown that the words "malt and fermented liquors" were

substituted for the words "ale and beer" used in the statute which was being revised, and which in that statute were absolutely prohibited in all their forms, and that that statute was enacted for the express purpose of curing a defect existing in the preceding one, which failed to prohibit malt liquor at all, in any of its forms. It will be observed that the word "any" immediately precedes the words "vinous, malt, and fermented liquors"; and this word must be given its meaning, as well as the word "other," which immediately precedes "intoxicating drinks." The statute must be construed, if possible, so that both words shall stand and perform their office in the sentence. The Century Dictionary defines the word "any" to "imply unlimited choice as to the particular unit, number, or quantity, and hence, subordinately as to quality, whichever, of whatever quantity or kind." The statute provides that if any person shall introduce, sell, etc., "any vinous, malt, or fermented liquors," and, if this word "any" is to be given its full meaning, it includes all of the liquors mentioned, in quality and kind as well as quantity; and, unless it was the intention of congress to use the word in this sense, it might as well have been omitted. If quantity alone was intended, its omission would not have destroyed the meaning or grammatical construction of the sentence. All, in quantity, would have been included without it; and hence, unless quality and kind are to be understood, it is a superfluous word, without meaning, and performing no office in the sentence. And this view of its meaning is strengthened by the frequent and emphatic use of the word throughout the entire statute. "That any person, whether an Indian or otherwise, who shall in said territory, manufacture, sell, give away, or in any manner, or by any means, furnish to any one, either for himself or another, any vinous, malt or fermented liquors, or any other intoxicating drinks of any kind whatsoever, whether medicated or not; or who shall carry, or in any manner have carried into

said territory, any such liquors or drinks, or who shall be interested in such manufacture, sale, giving away, furnishing to any one, or carrying into said territory any of such liquors or drinks, shall, upon conviction thereof.'' etc. And inasmuch as the subject-matter of the legislature was that of intoxicating liquors, under the rule laid down in the aforesaid Oleomargarine Case, this would be a declaration of congress—a finding of the fact by it—that all are intoxicating and prohibited. And, in connection with the use of this word, the very fact that it is followed by the words ''other intoxicating drinks'' seems to us to evidence the fact that congress intended to use the word ''any'' in its full meaning, and to emphasize the fact that its intention was to include all forms of malt and fermented liquors sold to be used as drinks or as a beverage in the Indian Territory. And upon an examination of the history of this legislation relating to the introduction and sale of intoxicants in the Indian country, the purposes of the statute, the conditions that existed, and the evils sought to be remedied, it will be seen, we think, that no other construction can be reasonably given to it. The first statute on this subject was enacted July 9, 1832, shortly after the lands of this territory were ceded to the Indians, and during the time they were being removed upon them. This statute is as follows: ''Sec. 2139. No ardent spirits shall be introduced under any pretense into the Indian country. Every person who sells, exchanges, gives, barters, or disposes of any spirituous liquors or wines to any Indian under the charge of any Indian superintendent or agent, or introduces or attempts to introduce any spirituous liquors or wines into the Indian country, shall be punishable,''etc. It will be observed that here nothing but ardent and spiritous liquors and wines are mentioned. But they were not to be introduced ''under any pretense.'' The maximum punishment was a fine of $300 and imprisonment for two years. This statute was continued in force until July

23, 1892, at which time it was amended so as to include ale and beer, the punishment remaining the same as in the original section. The amendment, so far as it effects this question, is as follows: "No ardent spirits, ale, beer, wine or intoxicating liquors of whatever kind, shall be introduced under any pretense into the Indian country. Every person who sells, exchanges, gives, barters or disposes of any ardent spirits, ale, beer, wine, or intoxicating liquors of any kind to any Indian under charge of any Indian superintendent or agent, or introduces or attempts to introduce any ardent spirits, ale, beer, wine, or intoxicating liquor of any kind into the Indian country, shall be punished," etc. This amendment was brought about by the decision of the supreme court of the United States in the case of Sarlls vs U. S. 152 U. S. 570, 14 Sup. Ct. 720, in which it was held that lager beer was not an ardent or spirituous liquor, and therefore not included as an article intended by the original statute. It is a matter of the history of this country, so notorious as to become common knowledge here, that immediately after that decision this country was flooded with lager beer. It was brought in by the car load, and drunkenness and rowdyism in their worst forms prevailed throughout the land. This condition of affairs was brought to the attention of congress, which resulted in the prompt enactment of the above amendment. It will be noticed that the word "other," or any other limitation, does not follow "ale and beer"; and therefore, those liquors, in all of their forms, whether intoxicating or not, were prohibited. The language is, "No ardent spirits, ale, beer, wine or intoxicating liquors of whatever kind shall be introduced," etc. Here ale and beer were designated by name, and, as before stated, without qualification or limitation. There can be no question as to the construction of this statute.

The liquor in controversy in this case is what is

known as "lager beer." The astute brew master of the firm which manufactured it testifies that it is beer with a less per cent. of alcohol than is contained in ordinary beer; that it is the second brew or draw of that manufactured by his employer's manufactory. Under this amendment this beer was unquestionably prohibited. While this statute was in force, of course, lager beer, by name, was no longer introduced; but it suddenly dawned on the minds of the gentlemen engaged in the manufacture of the forbidden products that the health of the people of this country was such that they stood in need of some kind of health restorative and tonic. Hence the country was filled with such decoctions as "Rochester Tonic," "Vegetable Bitters," "Malt Nutrines," and numerous other pretended health restoratives. The result of the legislation was only to change the labels on the bottles. The proof in this case shows that the beer sold by the defendant was at one time introduced and sold in this country under the name of "Malt Ale," but the name, we suppose, was too suggestive. Hence we now have "Rochester Tonic," but it is simply a change in name to suit the change in law. Congress had not yet prohibited, in terms, medicated intoxicants. In the interim there had sprung up here a domestic liquor, manufactured by the process of boiling grain, to which was added malt, hops, and sugar, and then set aside to ferment until it should become sufficiently alcoholic for use. Congress had not yet prohibited the manufacture and sale in this country of fermented or malt liquors. It had, however, prohibited intoxicating liquors. Hence, as to all except those specified by the statute, the government was required, before it could secure a conviction, to prove that the article was intoxicating; and as this had to be done generally by the patrons of those who sold, and who, if they testified to the truth, would be cut off from their daily libations of health-restoring tonics, it became difficult to enforce the statute. In prohibition countries

there is a strong affinity between the seller of intoxicants and the buyer. They are particeps criminis, and are both interested. In the meantime the country was filling up with people, but drunkenness and crime was on the increase. All remember the deplorable condition of affairs. No man's life or property was safe. Bands of bandits and murderers roamed ad libitum throughout the land. The robbing of post offices, stores, and railroad trains, and the consequent slaughter of innocent men, were of almost daily occurrence. The newspapers of the country were filled with thrilling accounts of these and other tragedies being enacted here, which were drenching the land with blood shed by the hands of the lawless. The courts and their officers were heroically struggling to suppress this condition of lawlessness, but, as then organized, they were powerless. When this carnival of crime was at its height, congress undertook to apply a remedy for the evil. By the act of March 1, 1895 (28 Stat. 693), it provided that all jurisdiction over this territory should be taken away from the United States district and circuit courts located at Ft. Smith, Ark., and Paris, Tex., and a complete system of judiciary was established here. At that time there were but one judge and one marshal, and nine United States commissioners and nine constables allowed by the law for this territory. There were but three places designated for holding court. The act of 1895 provided for two additional judges and marshals, with their forces. It increased the number of commissioners and constables to eighteen each. It provided for thirteen places for holding court, instead of three, as before, and conferred upon these courts full criminal and civil jurisdiction, and established this court of appeals. And then, as an additional remedy for the existing evil, by a provision of the same statute, it again undertook to exercise its theretofore baffled legislative skill in revising and remodeling the liquor laws existing here, and enacted as a part of the same bill the statute

which we are now construing.  By this revision, unless the word "other" had a different effect, in every particular it enlarged the scope of the old statute so as to embrace a wider field, both as to the persons and as to the kinds of liquor forbidden.  First, it adds to the old law manufacturing, so as to include those who made homemade beers;  next it provides that those who by any means furnish to any one, either for himself or another,  or who shall be interested in such introduction, sale, etc., shall be included, thus embracing agents and go-betweens,  and those for whom it is brought into the country, as well as those who actually carry it across the line or sell or give it away.  It then changes the phraseology of the act, using the more comprehensive words, "any malt or fermented liquors, " instead of "ale and beer," as used in the old statute, and thus includes. all alcoholic drinks.  Then it adds to the words "intoxicating liquors of any kind" the words "whether medicated or not";  thus including, bitters, tonics, and all of that well-known class of fraudulent compounds which, under the guise of medicines for the relief of the sick, are intruduced into this country to be sold in the saloons.  And then the statute increased the punishment from a fine of $300 to $500, and the term of imprisonment from two years to five.  And yet it is claimed that congress was taking a step backward, and that it intended, because it used the word "other," to exclude that which was included in the old;  that thereafter, instead of prohibiting all ale and beer, only that class of alcoholic drinks, including ale and beer, should be prohibited which was intoxicating;  that the right to introduce and sell drinks which are confessedly alcoholic, and to be used as beverages, shall be tested by the fact as to whether the alcohol which they contain shall come just below or just above the uncertain line of intoxication.  The evident object of congress in making the change of phraseology in the statute from "ale and beer" to "any malt or fermented liq-

uors" was not to exclude that which the old had included, but it was to include in the new law that which was excluded by the old, by using an expression broad enough to cover all forms and kinds of alcoholic drinks.

Thus far we have treated the statute of March 2, 1895, as being the one in force in this territory, but we entertain grave doubts as to whether the statute of January 30, 1897, is not in force here; and, if so, in our opinion the question in this case is put beyond controversy. The statute is as follows: "That any person who shall sell, give away, dispose of, exchange, or barter, any malt, spirituous or vinous liquor, including beer, ale and wine, or any ardent or other intoxicating liquor of any kind whatsoever, or any essence, extract, bitters preparation, compound, composition, or any article whatsoever, under any name, label or brand, which produces intoxication, to any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the government, or to any Indian a ward of the government under charge of any Indian superintendent or agent, or any Indian, including mixed bloods, over whom the government, through its departments, exercises guardianship, and any person who shall introduce, or attempt to introduce, any malt, spirituous or vinous liquor, including beer, ale and wine, or any ardent or intoxicating liquor of any kind whatsoever into the Indian country, which term shall include any Indian allotment while the title to the same shall be held in trust by the government, or while the same shall remain inalienable by the allottee without the consent of the United States, shall be punished by imprisonment for not less than sixty days, and by a fine of not less than one hundred dollars for the first offense and not less than two hundred dollars for each offense thereafter: provided, however, that the person convicted shall be committed until the fine and costs are paid. But it shall be a sufficient defense to any charge of introducing or attempting to introduce

ardent spirits, ale, beer, wine, or intoxicating liquors into
the Indian country, that the acts charged were done under
authority, in writing, from the war department, or any offi-
cer duly authorized thereunto by the war department." 29
Stat. 506. This statute unquestionably prohibits the intro-
duction and sale to Indians of malt liquors in all its qualities,
including ale and beer, for they are specifically mentioned;
and if it be conceded that it is not in force, yet when it is
remembered that this statute and that of 1895 were both
enacted for the same purpose, and to cure the same defects
of the statute of 1892, and that they relate to the same sub-
ject matter, and were passed to remedy the same evil exist-
ing in different parts of the country, it is persuasive that the
intention in both cases was the same, and may be taken,
inferentially at least, as a legislative interpretation of the
meaning of the statute of 1895. The law as it existed prior
to the act of 1895 prohibited ale and beer in all of their
forms. The first act passed afterwards, relating to the same
conditions, prohibits malt liquors, ale and beer, in all of
their forms. Did congress intend to make an exception in

*All malt liquor prohibited.* the act of 1895? We think not, and therefore hold that malt
and fermented liquors, when to be used as beverages or for
drinks, are prohibited by the statute, in all of their forms,
and the question as to whether or not they are intoxicating
is immaterial.

In this case the defendant was acquitted in the courts
below, and, inasmuch as he was there charged with a felony,
he cannot again be tried for the same offense. Mansf. Dig.
§ 2453; Jones vs State, 15 Ark. 262; State vs Czarinkow, 20
Ark. 160. The holding of the court below is reversed.

TOWNSEND, J., dissents.

THOMAS, J. (concurring) For many years congress has
attempted by legislation to prohibit the introduction and

sale of intoxicating liquors in the Indian Territory. The act of March 1, 1895, prohibits the introduction, manufacture, and sale of vinous, malt, or fermented liquors. The act of January 30, 1897, entitled "An act to prohibit the sale of intoxicating liquors to Indians," is simply supplemental to the act of March 1, 1895, and is, and undoubtedly was, intended to be in force in the "Indian country." The Indian Territory is peculiarly the Indian country. Intoxication is not produced by alcohol alone. There are other agencies equally as intoxicating, and infinitely more deleterious and dangerous. The record does not present the case fairly, and has the appearance of a trap laid for this court, by which an opinion could be extorted under which Hop Ale, Rochester Tonic, and other intoxicating concoctions under various names, could be introduced and sold in the Indian Territory. This member of this court will not allow himself to be made a tool of by any manufacturing or commercial interest, whereby the peace, the health, the morality, the prosperity, and the happiness of the people of the Indian Territory are to be destroyed or subordinated to the avarice of the vendors of intoxicating beverages. Hop Ale and Rochester Tonic are only a little less intoxicating than lager beer, and are infinitely more dangerous. Where an article, such as malt liquors, is specifically prohibited by the statute, the burden does not rest upon the government to prove that it is intoxicating. For these and many other reasons I concur in Judge CLAYTON'S decision that the judgment of the lower court should be reversed.