JACOB HOFFMANN BREWING CO. v. McELLIGOTT, Collector of Internal Revenue, et al.

(District Court, S. D. New York.  May 17, 1919.)

No. 455.

1. UNITED STATES ⬤125—SUITS AGAINST UNITED STATES—CONSENT.
    A suit in equity against a district attorney to restrain enforcement of a federal statute alleged to be unconstitutional is not one against the United States.

2. UNITED STATES ⬤125—JURISDICTION—SUITS AGAINST UNITED STATES—WAIVER OF IMMUNITY.
    No suit can be maintained against the United States in any court without the express authority of Congress, and such immunity from suit cannot be waived by any officer.

3. INJUNCTION ⬤105(1)—RESTRAINING CRIMINAL PROSECUTIONS.
    A court of equity may restrain prosecuting officers, either of a state or of the federal government, to prevent a series of unauthorized prosecutions, which may prove ruinous to persons either in their property, or business.

4. INJUNCTION ⬤105(1)—RESTRAINING CRIMINAL PROSECUTIONS.
    While a district attorney is vested with some discretion as to the institution of prosecutions, where he insists upon a construction of a penal statute which is incorrect, and which would subject a complainant and its officers and employés to criminal prosecutions, which would result in irreparable injury to its business, it is not obliged to rely on the chance that the district attorney will exercise his discretion not to prosecute, but may invoke equitable relief.

5. INTOXICATING LIQUORS ⬤137—MANUFACTURE—WAR-TIME PROHIBITION ACT—CONSTRUCTION.
    In the provision of Act Nov. 21, 1918, § 1, that "no grains, cereals, fruit or other food product shall be used in the manufacture or production of beer, wine or other intoxicating malt or vinous liquors for beverage purposes," the words "beer" and "wine" are qualified by "intoxicating," and the act does not prohibit the manufacture of beer which is not in fact intoxicating.

6. INTOXICATING LIQUORS ⬤17—WAR-TIME PROHIBITION ACT—CONSTITUTIONALITY.
    The provision of Act Nov. 21, 1918, § 1, prohibiting the manufacture of beer, wine, or other intoxicating malt or vinous liquors for beverage purposes, whether construed to prohibit the manufacture of any beer or wine, or only such as is intoxicating, is constitutional.

In Equity.  Suit by the Jacob Hoffmann Brewing Company against Richard J. McElligott, Acting and Deputy Collector of Internal Revenue of the Third District of New York, and Francis G. Caffey, United States Attorney for the Southern District of New York.  On motion to dismiss amended bill.  Denied.

Order modified, 259 Fed. 525, —— C. C. A. ——.

---

Root, Clark, Buckner & Howland, of New York City (Elihu Root and William D. Guthrie, both of New York City, and William L. Marbury, of Baltimore, Md., of counsel), for complainant.

Francis G. Caffey, U. S. Atty., of New York City (William C. Fitts, of Washington, D. C., and Vincent H. Rothwell and Cornelius J. Smyth, both of New York City, of counsel), for defendants.

AUGUSTUS N. HAND, District Judge. This is a motion to dismiss the amended bill under equity rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi) on the ground: (1) That the suit is in effect one against the United States which has not consented to be sued; (2) that the bill seeks to restrain the enforcement of a criminal law; (3) that the complainant has an adequate remedy at law; (4) the Act of Congress prohibits all beer, irrespective of alcoholic content, consequently the threats complained of are lawful and cannot be enjoined.

The complainant contends that the Act of Congress which the defendants threaten to enforce if having the effect contended for by them is unconstitutional.

The complainant is, and for many years has been, engaged in brewing lager beer, and has a valuable brewery, with numerous employés and substantial earning capacity. Since the passage by Congress of the act of August 10, 1917, and the President's proclamations thereunder, complainant has manufactured and sold beer only in accordance with the terms of the act and the executive proclamations. All such beer has contained not to exceed 2.75 per cent. of alcohol by weight, and according to the allegations of the bill *is not in fact intoxicating*.

The act of August 10, 1917, was passed to provide for the national security and defense by encouraging the production and conservation of food during the war, and authorized the President to regulate or prohibit the production of malt or vinous liquors. By its terms he was empowered:

"To prescribe and give public notice of the extent of the limitation, regulation, prohibition, or reduction so necessitated. * * *"

And whenever such notice was given, no person could use any materials in the production of malt or vinous liquors, except under a license issued by the President and in compliance with rules and regulations determined by him, and any person who willfully violated the provisions of the act was punishable by a fine not exceeding $5,000 or by imprisonment for not more than two years, or both.

In order to carry out the purposes of the act, the President was authorized to create any agency and to utilize any department of the government. He deputed the Secretary of the Treasury and the Commissioner of Internal Revenue to carry out the act, subject to his instructions, and issued a proclamation on December 8, 1917, forbidding the production of all malt liquor, except ale and porter, containing more than 2.75 per cent. of alcohol by weight. He issued a proclamation on September 16, 1918, prohibiting after December 1, 1918, the "production of malt liquors, including near beer, for beverage purposes, whether or not such malt liquors contain alcohol." Thereafter,

on January 30, 1919, a further proclamation was issued under the same act, which, after reciting that the prohibition of the use of grain in the manufacture of beverages which are not intoxicating has been found no longer essential in order to assure an adequate and continuous supply of food, modified the former proclamation to the extent of permitting the use of grain in the manufacture of beverages which are not intoxicating.

On March 4, 1919, the President issued a fourth proclamation under the same act, amending his proclamation of September 16, 1918, so as to prohibit the production only of "intoxicating malt liquors for beverage purposes." As has also been stated, the bill alleges that complainant's beer is not intoxicating.

On November 21, 1918, after the armistice, Congress passed an act "to enable the Secretary of Agriculture to carry out" the former Food Conservation Act of August 10, 1917, and provided that:

"After June 30, 1919, until the conclusion of the present war and thereafter until the termination of demobilization * * * for the purpose of conserving the man power of the nation, and to increase efficiency in the production of arms, munitions, ships, food, and clothing for the army and navy, it shall be unlawful to sell for beverage purposes any distilled spirits, and during said time no distilled spirits held in bond shall be removed therefrom for beverage purposes except for export. After May 1, 1919, until the conclusion of the present war and thereafter until the termination of demobilization, * * * no grains, cereals, fruit, or other food product shall be used in the manufacture or production of beer, wine, or other intoxicating malt or vinous liquor for beverage purposes. After June 30, 1919, until the conclusion of the present war and thereafter until the termination of demobilization, * * * no beer, wine, or other intoxicating malt or vinous liquor shall be sold for beverage purposes except for export. * * * After the approval of this act no distilled, malt, vinous or other intoxicating liquors shall be imported into the United States during the continuance of the present war and period of demobilization. * * *

"Any person who violates any of the foregoing provisions shall be punished by imprisonment not exceeding one year, or by fine not exceeding $1,000, or by both such imprisonment and fine: Provided, that the President of the United States be, and hereby is, authorized and empowered, at any time after the passage of this act, to establish zones of such size as he may deem advisable about coal mines, munition factories, shipbuilding plants, and such other plants for war material as may seem to him to require such action whenever in his opinion the creation of such zones is necessary to, or advisable in, the proper prosecution of the war, and that he is hereby authorized and empowered to prohibit the sale, manufacture, or distribution of intoxicating liquors in such zones, and that any violation of the President's regulations in this regard shall be punished by imprisonment for not more than one year, or by fine of not more than $1,000 or by both such fine and imprisonment: Provided further, that nothing in this act shall be construed to interfere with the power conferred upon the President by section 15 of the Food-Control Act, approved August 10, 1917. * * *"

Prior to February 6, 1919, the Commissioner of Internal Revenue permitted the brewing of beer of 2.75 per cent. of alcohol by weight. February 6, 1919, regulations were promulgated by the Commissioner forbidding the brewing of beer on or after May 1, 1919, where the alcoholic content should exceed one-half of 1 per cent. by volume, and forbidding the sale of beer after June 30, 1919, having a greater alcoholic content than one-half of 1 per cent. by volume, and likewise

refusing to allow brewers to qualify after May 1st, and directing revenue officers to report violations.

All the foregoing matters are set forth in the bill of complaint. Complainant contends in general that the act of Congress of November 21, 1918, prohibits only the manufacture and sale of malt or vinous liquors that are actually intoxicating, and delegates to no official the right to apply any standard that will not meet such a practical test. The bill alleges that it is—

"the purpose, intent and threat of the Commissioner of Internal Revenue, his agents and subordinates, * * * as well of the Department of Justice of the United States and its agents, officers, members and employés, including the defendant Francis G. Caffey, to enforce against the complainant, its officers, agents and servants, numbering more than 70, the various pains and penalties, including fine and imprisonment and various forfeitures of property, provided by said act of Congress and other laws and regulations, and thus involve the complainant, its officers, agents and servants in numerous suits and threaten it with the disorganization and dispersion of its staff of skilled and trained employés by frightening them into quitting its employ to avoid prosecution and possible punishment, the destruction of its business, the loss of its customers, and the depreciation, if not destruction, of its good will and property, all to the irreparable damage of the complainant and its stockholders, and which said injury and damage would be incapable of admeasurement and adjudication in an action at law. * * * *"

It is to be noted that the Treasury Department, by regulation or decision issued under date of February 6, 1919, quoted in the bill, interpreted the act of November 21, 1918, by declaring that—

"(b) Within the intent of the act of November 21, 1918, a beverage containing one-half of 1 per cent. or more of alcohol by volume will be regarded as intoxicating."

The United States attorney took the position upon the argument that while he had made, and did make, no actual threats, yet that the act of November 21, 1918, forbade the manufacture, after May 1, 1919, of any liquor which could be classed as beer, irrespective of whether it was intoxicating or not, and the sale of any such liquor after June 30, 1919. He also very properly said that he could offer no encouragement or immunity to those who manufactured or sold any liquors not in accord with his construction of the statute, though he would expect to institute no prosecutions while his motion was pending.

[1] The United States attorney, in challenging the jurisdiction of a court of equity over his actions, relies largely on the decisions of the Supreme Court in Re Sawyer, 124 U. S. 200, 8 Sup. Ct. 482, 31 L. Ed. 402, and Fitts v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535. In the former case, the Supreme Court held that the Circuit Court of the United States had no jurisdiction to entertain a bill in equity to restrain the mayor and council of a city in Nebraska from removing a police magistrate upon charges filed against him for malfeasance in office; and Mr. Justice Gray, writing for the court, said that a bill in equity would not lie to restrain the appointment or removal of a municipal officer, and that the remedy lay by quo warranto or mandamus.

In the second case, where suit was brought by the receivers of a railroad company against the Attorney General of the state of Alabama

and the solicitor of the Eleventh judicial circuit of that state to re-. strain them as officers of the state from instituting criminal proceedings against a railroad and its officials for failure to reduce bridge tolls under the provisions of a state law, alleged to be unconstitutional, the court held that the cause of action was one in effect against the state and would not lie. The statute under which the prosecutions were instituted was not embraced in the law in question, and Mr. Justice Peckham, in Ex parte Young, 209 U. S. 156, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764, remarked that the law under which the prosecutions were threatened was not claimed to be unconstitutional, and distinguished the case on this ground. See, also, Louisville & Nashville R. R. Co. v. Greene, 244 U. S. 522, 37 Sup. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97.

In Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764, every argument made on this point by the United States attorney was discussed by the court, and the reasons in support of the position taken by the United States attorney were most impressively presented by Mr. Justice Harlan, in a dissenting opinion. The Supreme Court in that case expressly held that a suit by a railroad to enjoin confiscatory rates with statutory penalties imposed by the Legislature of Minnesota would lie against the Attorney General of that state, that he was not protected from suit by virtue of his office and the general discretion lodged in him to determine whether or not to prosecute a violation of an unconstitutional act, and that the suit was not against the state, but against an officer exceeding his authority.

In the case of Western Union Telegraph Co. v. Andrews, 216 U. S. 165, 30 Sup. Ct. 286, 54 L. Ed. 430, a statute of the state of Arkansas required a foreign corporation engaged in interstate commerce to pay as a license tax or fee for doing interstate business a given amount on its entire capital stock, whether employed within the state or elsewhere, and provided that the secretary of state should revoke the franchise of any company which did not conform to the provisions of the statute to do business in the state, and that such company should be subject to a penalty for each day it continued to do business in the state after such revocation. The Supreme Court unanimously affirmed the doctrine laid down in Ex parte Young, and reversed a decision of the District Court, dismissing a bill to enjoin the prosecuting attorneys in the state of Arkansas from instituting actions against the company to recover the penalties for each alleged violation of the act.

In the case of Philadelphia Co. v. Stimson, 223 U. S. 605, 32 Sup. Ct. 340, 56 L. Ed. 570, the Supreme Court unanimously held that a suit for injunctive relief would lie against the Secretary of War for illegally establishing harbor lines, which would cast a cloud upon the title of the complainant and would result in the institution of criminal actions by federal district attorneys to enforce penalties upon request of the Secretary of War. The bill was in fact dismissed by the Supreme Court upon the ground that the Secretary of War was not proceeding illegally, but the opinion explicitly sustained the jurisdiction, and Mr. Justice Hughes, who wrote, said that the court had jurisdic-

tion to grant equitable relief in a proper case, where the act under which the public official was proceeding was unconstitutional, or where the official was—

"insisting that he has the warrant of the statute, is transcending its bounds, and thus unlawfully assuming to exercise the power of government against the individual. * * * "

See also Louisville & Nashville R. R. v. Greene, 244 U. S. 528, 37 Sup. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97.

A situation still more like the case at bar was presented in Truax v. Raich, 239 U. S. 33, 36 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283, where a suit was instituted against the Attorney General of Arizona who was proceeding to enforce an unconstitutional statute directed against employment of aliens. There was no injury to property involved in that case, except the indirect injury which exists in the case at bar, arising from the interference with the business of employers and the livelihood of employés who may be prosecuted under the act.

In the case of Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, which raised the question of the validity of the act of Congress establishing an eight-hour day for employés engaged in interstate and foreign commerce, the only party defendant was the United States attorney for the Western district of Missouri. The statute provided that any one who violated the provisions of the act should be subject to a fine and imprisonment. No direct relation to the property of the railroad, on behalf of which a suit for an injunction was brought, appears to have existed; but it is manifest that the indirect effect upon the property of the road of the enforcement of the act, if it had been unconstitutional, would have been most substantial. The government, as will be seen by referring to its brief, at pages 9 and 17, urged that the suit was one against the United States and had "none of the elements of rate accounting pending which the enforcement of penalties may be restrained." Yet the Supreme Court entertained jurisdiction, and while the opinion did not comment upon the question whether the United States Attorney could be sued, nevertheless passed on the question which was distinctly raised.

In the case of Hammer v. Dagenhart, 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101, Ann. Cas. 1918E, 724, suit was brought against the United States attorney for the Western district of North Carolina, to enjoin him from enforcing an act of Congress prohibiting the shipment of articles produced in establishments where children were employed. The statute provided fines and imprisonments in case of violation. I cannot find from the brief of the government that jurisdiction of the court was questioned, but the propriety of the suit in this respect was discussed in the brief filed in the Supreme Court for the complainants, appellees, who referred to the case of Truax v. Raich, 239 U. S. 33, 36 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283, stating that the complaint was drawn in accordance with the precedent of that case and that the Supreme Court had approved such a method of testing a federal statute in passing upon the

constitutional question that involved the question of the validity of the Adamson Law (Act Sept. 35, 1916, c. 436, 39 Stat. 721 [Comp. St. §§ 8680a–8680d]) in the case of Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024. The bill in the case of Hammer v. Dagenhart, supra, was sustained, and the only result which would have followed the failure of a court of equity to intervene would have been prosecution by the United States attorney and the discharge of the children employed by the employer. This indirect injury to property was all that sustained the jurisdiction. Even if there had been no prior decisions of the Supreme Court such as Ex parte Young and Truax v. Raich, supra, the cases of Wilson v. New and Hammer v. Dagenhart, would seem to be sufficient to require me to hold that this court has jurisdiction of the present suit against the United States attorney. In Wilson v. New the point, though perhaps not seriously considered, was as distinctly raised as it could be.

[2] The case of Porto Rico v. Ramos, 232 U. S. 627, 34 Sup. Ct. 461, 58 L. Ed. 763, will hardly justify the contention that immunity is a personal matter which may be waived by the United States attorney. There the Attorney General of Porto Rico, the government of which had been held in the case of Porto Rico v. Rosaly, 227 U. S. 270, 33 Sup. Ct. 352, 57 L. Ed. 507, to come within the general rule exempting a sovereign from being sued without its consent, voluntarily petitioned to be made a party, asserting rights to the property in controversy, and against the opposition of the plaintiff was made a party. Porto Rico was therefore merely exercising rights of intervention, and in substance bringing a suit.

In the case of Richardson, as treasurer of Porto Rico, v. Fajardo Sugar Co., 241 U. S. 44, 36 Sup. Ct. 476, 60 L. Ed. 879, the treasurer of Porto Rico, who had been sued in the United States District Court for Porto Rico, appeared and answered the complaint, and it was held that under these circumstances it could not deny the court's jurisdiction, because if its sovereignty exempted it from suit, the exemption would only exist where it challenged the jurisdiction of the court at the outset. This, I think, has been the general rule as to foreign sovereigns or quasi sovereigns, and would unquestionably apply to a foreign official who appeared in the courts of the United States, and did not raise the question of jurisdiction.

In regard to officials of the United States it has been expressly held by the Supreme Court in the case of Stanley v. Schwalby, 162 U. S. at pages 269–270, 16 Sup. Ct. 754, 760 (40 L. Ed. 960) that no suit can be maintained against the United States in any court without the express authority of Congress. The Supreme Court there said:

"Neither the Secretary of War, nor the Attorney General, nor any subordinate of either, has been authorized to waive the exemption of the United States from judicial process, or to submit the United States, or their property, to the jurisdiction of the court in a suit brought against their officers."

See, also, Carr v. United States, 98 U. S. 438, 25 L. Ed. 209; United States v. Lee, 106 U. S. 205, 1 Sup. Ct. 240, 27 L. Ed. 171.

In the case of Minnesota v. Hitchcock, 185 U. S. 373, 22 Sup. Ct.

650, 46 L. Ed. 954, Mr. Justice Brewer, writing for a unanimous court, held that the Supreme Court had original jurisdiction of suits by a state against the United States, where the latter consented to be sued, and that under the act of Congress March 2, 1901, c. 808, 31 Stat. 950 (Comp. St. § 4881) the Secretary of the Interior could be made a party defendant in a litigation to determine the right of a state .to what are commonly known as school lands within an Indian reservation. The court there said:

"A preliminary question is one of jurisdiction. It is true counsel for defendants did not raise the question, and evidently both parties desire that the court should ignore it and dispose of the case on the merits. But the silence of counsel does not waive the question, nor would the express consent of the parties give to this court a jurisdiction which was not warranted by the Constitution and laws. It is the duty of every court of its own motion to inquire into the matter irrespective of the wishes of the parties, and to be careful that it exercises no powers save those conferred by law. Consent may waive an objection so far as respects the person, but it cannot invest a court with a jurisdiction which it does not by law possess over the subject-matter. The question having been suggested by the court, a brief has been presented, and our jurisdiction sought to be sustained on several grounds. * * *"

[3] The result of the authorities seems to be that, whatever may have been the original English doctrine as to the right to resort to chancery to restrain the Attorney General from prosecutions in excess of authority, it is now well settled by the decisions of the Supreme Court that a court of equity may restrain prosecuting officers, either of a state or of the federal government, as well as other public officials, to prevent a series of unauthorized prosecutions which may prove ruinous to persons either in their property or in the business which is their means of livelihood. In the recent case of International News Service v. Associated Press, 248 U. S. 236, 39 Sup. Ct. 68, 63 L. Ed. ——, the Supreme Court, in discussing the basis of equitable jurisdiction, pointed out that the term "property" is to be given a broad meaning, and said:

"In order to sustain the jurisdiction of equity over the controversy, we need not affirm any general and absolute property in the news as such. The rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right * * * and the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard property already acquired."

See Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169; Truax v. Raich, 239 U. S. 33, 36 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283; Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024; Hammer v. Dagenhart, 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101, Ann. Cas. 1918E, 724; Municipal Gas Co. v. Public Service Comm., 225 N. Y. 89, 121 N. E. 772.

In the last case, Judge Cardozo (225 N. Y. at page 102, 121 N. E. at page 776) said:

"There is protection against the penalties that crush and against losses that cripple."

When the Supreme Court entertained jurisdiction to enjoin criminal proceedings, that would substantially injure the railroads until the validity of the Adamson Law could be tested in a single suit, it must follow, I think, that a construction of the act under consideration can properly be had in the case at bar, and the public prosecutor be stayed from prosecutions which would certainly enormously damage the complainant and others if the theory of the law which both he and the Attorney General maintain is incorrect. Nor do I think that the quasi judicial character of the office of the United States attorney is a sufficient ground for denying equitable relief. It is true that he has a discretion whether to prosecute in any case or not, but that is so in many instances of prosecuting state officials, and also even of administrative officers. It was true of the Secretary of War in the case of Philadelphia Co. v. Stimson, 223 U. S. 605, 32 Sup. Ct. 340, 56 L. Ed. 570, and the Attorney General of New York in Municipal Gas Co. v. Public Service Commission, 225 N. Y. 89, 121 N. E. 772.

The United States attorney says that he has made no actual threats, but has only argued for a certain construction of the act under consideration. Perhaps the situation is somewhat different from that of an unconstitutional act clearly forbidding a certain line of conduct and imposing penalties, for an advocate may properly argue in court for a certain construction of an ambiguous law without fully intending to adopt his arguments in practice, unless a judicial decision is had in his favor. Yet the United States attorney is here making, as is quite proper, no absolute disclaimer of an intention to prosecute, and merely stating that, if the situation should not change, he would not prosecute until some decision is rendered. Moreover, this case is before the court on a bill which alleges that it is the threat of the United States attorney to enforce against—

"the complainant, its officers, agents, and servants, numbering more than 70, the various pains and penalties including fine and imprisonment and various forfeitures of property, * * * all to the irreparable damage of the complainant and its stockholders, and which said injury and damage would be incapable of admeasurement and adjudication in an action at law."

Certainly, if the prosecutions were instituted, the damages would be irreparable and could not, so far as I am aware, be recovered in any form of legal action. If the complaint is too indefinite as to threats, the complainant may be made, on motion, to particularize the threats he alleges. As Judge Cardozo said in Municipal Gas Co. v. Public Service Commission, supra:

"Undoubtedly the plaintiff has some remedy at law. The decisive point is that it is not as complete or efficient as the remedy in equity."

[4] I am satisfied, after painstaking investigation, that if the United States attorney persists in a construction of the act which is in fact incorrect, and would naturally result in penalties and forfeitures, the bill will lie, and the complainant will, in the absence of a disclaimer, be entitled to final injunctive relief. It should not be obliged, under such circumstances, to take the chance that the United States attorney would always exercise his discretion in not instituting prosecutions for what he believed to be repeated violations of a penal statute. Waite

v. Macy, 246 U. S. 606, 38 Sup. Ct. 395, 62 L. Ed. 892; Vicksburg Water Works Co. v. Vicksburg, 185 U. S. 82, 22 Sup. Ct. 585, 46 L. Ed. 808.

For the foregoing reasons, I am satisfied that this suit is not against the United States, and may be entertained against the United States attorney, because it affects rights of property, and that the complainant, if his contentions be sound on the merits has no adequate remedy at law.

Ample jurisdiction is shown over the acting collector of internal revenue. Not only does the original bill allege that his predecessor was threatening to enforce various pains and penalties, including forfeitures of property, but the supplemental bill alleges that he has refused to collect from brewers the stamps, and refused to issue these stamps which the act of February 24, 1919, requires shall be placed upon fermented liquor containing one-half of 1 per cent. or more of alcohol. For failure to affix such stamps, penalties are imposed by law, and it is perfectly clear, I think, that the beer can also be forfeited under the provisions of sections 3340, 3354 and 3453 of the Revised Statutes (Comp. St. §§ 6146, 6160, 6161). Section 3164 (section 5884) also provides for a report by the collector to the United States attorney of facts furnishing a basis for forfeiture proceedings.

The Commissioner of Internal Revenue has promulgated regulations condemning the brewing after May 1, and the sale after June 30, 1919, of beer having an alcoholic content of over ½ of 1 per cent. by volume, refusing to allow brewers to qualify after May 1, and on April 12, 1919, has declared, in respect to the Act of November 21, 1918, that:

"Existing revenue laws with regard to the control of illicit manufacture and sale will of course remain in force until repealed by the Congress. Their enforcement will continue to be given the vigorous attention of revenue officers until repealed."

In view of such a pronouncement by his superior, it is idle to contend that there is not danger of seizure by the collector where the interpretation put by the commissioner on the act of November 21, 1918, is sought to be disregarded as incorrect.

[5] I now come to a consideration of the merits, and of the proper construction of the words in the act of November 21, 1918:

"Beer, wine, or other intoxicating malt or vinous liquors for beverage purposes."

Such a clause can be understood best by the context and the general circumstances. The citation of judicial precedents is often of as little value in reaching a proper interpretation as in cases to construe contracts or wills, where each expression, unless clearly defined by settled usage, must be determined in the light of its own surroundings. Now, in the first place, the commissioner interprets the act in Regulations 14 (b) (d), and (e), and provides that:

"(b) Within the intent of the act of November 21, 1918, a beverage containing one-half of 1 per cent. or more of alcohol by volume will be regarded as intoxicating."

"(d) After May 1, 1919, persons will not be permitted to qualify as brewers where the alcoholic content of their product at any time during the process of

manufacture equals or exceeds one-half of 1 per cent. by volume, regardless of the alcoholic content when removed for consumption or sale. After that date, when brewers will not be permitted to qualify as such by reason of the act of November 21, 1918, for the manufacture of either beer or near beer, it will be necessary for manufacturers desiring to produce near beer exceeding one-half of 1 per cent. of alcohol by volume at any stage of its manufacture to qualify as industrial distillers under the act of October 3, 1913, and regulations made in pursuance thereof, subject to the so-called 'spoiled corn' order while the same remains in effect.

"(e) Manufacturers of near beer, regardless of the method of production, are charged with the duty of seeing that the product is less than one-half of 1 per cent. of alcohol by volume and always so remains until it is consumed. It is obvious, therefore, that it should be marketed in glass bottles or other sterile containers, after pasteurization or otherwise destroying the yeast, where the same contains fermentable matter when marketed. Unless this product is thus marketed, the barrel tax and all special taxes will be asserted, and prosecution instituted, if the product is found on the market containing one-half of 1 per cent. or more of alcohol by volume. (See T. D. 2410.)"

I realize that the government cites various Treasury Decisions holding that no malt liquors should be taxed as beer where the alcoholic content is less than one-half of 1 per cent. and argues from this that by the standard adopted in the foregoing regulations of February 6, 1919, the commissioner has not defined intoxicating beer as a liquor having one-half of 1 per cent. or more alcohol in volume, but has simply held that malt liquor of a lower percentage is not beer at all. He does, however, in Regulation 14(d) expressly permit the manufacture of "beer or near beer" having such a limited percentage of alcohol, and in effect merely continues after May 1st the regulation prescribed before. He does it upon the ground stated in 14(b) that—

"A beverage containing one-half of 1 per cent. or more of alcohol by volume will be regarded as intoxicating."

Thus the test and standard is purely the decision of the Department that any beer having a percentage of one-half of 1 per cent. or more of alcohol is intoxicating. That the act of November 21, 1918, prohibits only intoxicating beer is therefore the real ruling of the Department, and, whatever language may be used in arriving at this result, the Department in effect interprets the meaning of the act as I do, and treats no beer as barred which it does not regard as intoxicating. That the Treasury Department should interpret the act as only applying to what it considers intoxicating beer is persuasive and entitled to great weight. United States v. Hermanos, 209 U. S. 337, 339, 28 Sup. Ct. 532, 52 L. Ed. 821; Komada v. United States, 215 U. S. 392, 396, 30 Sup. Ct. 136, 54 L. Ed. 249; Adams Express Co. v. New York, 232 U. S. 14, 30, 34 Sup. Ct. 203, 58 L. Ed. 483.

In the next place, I think it may be fairly said that, while total prohibition of nonintoxicants is recognized as a valid means of suppressing the liquor traffic (Purity Extract, etc., Co. v. Lynch, 226 U. S. 192, 33 Sup. Ct. 44, 57 L. Ed. 184), yet it is a means which ought to appear plainly in the act. Such a suppression of a drink confessedly harmless in itself cannot be implied from general language prohibiting intoxicating liquors.

Moreover, the prohibition of importation in the act is limited to intoxicating malt liquors, and the authorization of the President to es-

tablish zones where certain liquors are prohibited is directed to the prohibition of "intoxicating liquors."

Furthermore, it is provided that nothing in the "act shall be construed to interfere with the power conferred upon the President" under section 15 of the Food Conservation Act of August 10, 1917, and the President in his proclamations of January 30, 1919 and March 4, 1919, has permitted the use of grain in beverages which are not intoxicating, and in the last proclamation has declared that there is an abundant supply of grain.

It is contended by the government that the zone provisions and the President's proclamations all cover periods prior to June 30th, and are therefore consistent with the contention of the government that the production of nonintoxicants was not prohibited before May 1st, and the sale before June 30th. The application of the zone provisions, of the President's proclamations, and of the import provision may be correctly interpreted; but can it be said that an interpretation of the word "beer" as any beer, whether intoxicating or not, is borne out by such an argument? Is it likely that Congress would fail to empower the President to prohibit all beer of every kind in these important zones, if it had thought it necessary in the earlier provisions of the act to prevent subterfuge by excluding nonintoxicating beer? If the total prohibition of nonintoxicating malt liquors was essential after June 30th, it apparently was more vital in the interval between. Indeed, peace might be concluded and the army demobilized before any result would ensue which might be obtained by such an indirect aid in the suppression of alcoholic drinks as the prohibition of nonintoxicating liquors.

It is to be remembered that when the act was passed there was a presidential proclamation in existence prohibiting brewing of malt liquors; that thereafter the President, by reason of the abundance of grain, relaxed this restriction and limited it to nonintoxicating liquors. Is it likely, in view of these circumstances, that Congress did exactly the opposite, and started with a law more liberal than the proclamation in force, and ended, after much of the needed conservation would be likely to have lessened, with an absolute prohibition of nonintoxicating beer, while the President issued proclamations of an opposite character? Both in the acts and in the proclamations of the President, when there is intended to be prohibition of any beverage, the words are clear and unmistakable. The best argument made by the government is that the act is for conservation of grain, and that in this view a nonintoxicating beer is as wasteful as one with a higher alcoholic content. I think this argument, while at first persuasive, is met by the fact that the existing law of August 10, 1917, fully covered grain conservation measures, and that the provisions under consideration of the act of November 21, 1918, were—

"for the purpose of conserving the man power of the nation, and to increase efficiency in the production of arms, munitions, ships, food, and clothing for the army and navy."

In other words, the prime object was not to prevent unnecessary consumption of grain, which was already guarded against by the act of

August 10, 1917, but to increase the production of all things, including grain, which might contribute to national efficiency by prohibiting intoxicants. Congress evidently feared that the prohibition of intoxicating liquors, which was sought to be covered by the act of August 10, 1917, and the presidential proclamations in relation thereto, might be relaxed by the President if he should come to feel that as a measure to conserve grain a drastic inhibition of the use of it for brewing could not logically be longer defended. Under these circumstances, Congress, as I think, passed an act by virtue of its war power preventing after about six months the manufacture or sale of intoxicating liquors, in order "to increase efficiency  *  *  *  in production," irrespective of whether or not there should be any need of unusual abstention in the use of grain already produced. Any other interpretation of the act, not only does violence to the natural meaning of the words, but is utterly inconsistent with the fact that malt liquors, such as ale, stout, and porter, are by no possibility prohibited unless they are intoxicating. To single out nonintoxicating beer for prohibition, and leave nonintoxicating ale, stout, and porter to be manufactured and sold, would involve a construction of the act too unreasonable to be entertained. It is also to be observed that the provision of the act as to importation provides that:

"No distilled, malt, vinous or other intoxicating liquors shall be imported."

It is not contended, as I believe, that the word "malt" in this clause is not qualified by "intoxicating," and yet this clause is in the same act as the clause under consideration, and both should indubitably be construed in the same way. If the word "beer" does not mean "intoxicating beer," no meaning is given to the word "other," preceding the words "intoxicating malt or vinous liquors," and the entire Prohibition Act is rendered inconsistent and the meaning of the words forced and unnatural. Where a statute is intended to prohibit the use of liquors in themselves harmless, it can easily say so in unmistakable terms and will be upheld by the courts. This was clearly done by the President in his proclamatiion of September 16, 1918.

The Supreme Court construed such a clause as the one before us in the case of United States v. Chase, 135 U. S. 255, 10 Sup. Ct. 756, 34 L. Ed. 117. The question there was whether a private letter came within the statute prohibiting the mailing of "every obscene  *  *  *  book, pamphlet, picture, paper, writing, print, or *other publication* of an indecent character." Act July 12, 1876, c. 186, 19 Stat. 90 (Comp. St. §§ 10381, 10383). The court held that, "according to a well-defined rule of construction," the words "other publication" qualified the words preceding them, so that only published "writings," and not unpublished private letters, were within the act. The court said:

"In the statute under consideration, the word 'writing' is used as one of a group or class of words—book, pamphlet, picture, paper, writing, print—each of which is ordinarily and prima facie understood to be a publication; and the enumeration concludes with the general phrase 'or other publication,' which applies to all the articles enumerated, and marks each with the common quality indicated."

A prior case under the same statute, decided by Judge Deady, was United States v. Loftis (D. C.) 12 Fed. 671. It was there said:

"* * * Speaking generally, this letter is a writing; but to bring it within this clause of the statute it must be also a 'publication.' This word 'writing' occurs in an enumeration of things—books, pamphlets, pictures, prints, and papers—which ex vi termini are prima facie publications. The general phrase with which the enumeration ends, 'or other publication of an indecent character,' impliedly asserts that the things before enumerated are publications. The expression 'John and James and other men' is one in which, by a necessary implication, it is asserted that John and James are men."

The case of Rinker v. United States, 151. Fed. 755, 81 C. C. A. 379, decided by the Circuit Court of Appeals of the Eighth Circuit, of which Judge Van Devanter (now Mr. Justice Van Devanter) was a member, and the case of Timmons v. United States, 85 Fed. 204, 30 C. C. A. 74, decided by the Circuit Court of Appeals of the Sixth Circuit, of which Judge Lurton was a member, held that the language of the foregoing statute as to indecent publications, which had been amended so as to include the word "letters," did not render an indictment bad which described a letter as obscene, but did not describe it as indecent, merely because the clause of the statute defining nonmailable matter concluded with the words "or other publication of an indecent character." I do not think these cases in the least militate against the construction contended for by the complainant. The court said in the Timmons Case, the addition of the words " 'of an indecent character' * * * would add nothing to the meaning already conveyed, and would add no different meaning." That is to say, the qualifying terms, "or other publication of an indecent character," were only important in relation to the prior language of the clause in cases where that prior language might differ, or require some definition, from the qualifying clause. The courts held in substance that under the indictment in question the words "obscene" and "indecent" amounted to the same thing.

It is true that the Supreme Court, after the insertion of the word "letter" in the statute prohibiting the mailing of writing of an indecent character, held that an unpublished private letter came within the ban of the statute. Andrews v. United States, 162 U. S. 420, 16 Sup. Ct. 798, 40 L. Ed. 1023. This, as Judge Townsend said in the case of United States v. Ling (D. C.) 61 Fed. 1001, was because the insertion in the statute of the word "letter" could have no other reasonable purpose; that is to say, such a term as the word "letter," if not including a private letter, was fully covered by the word "writing." The object of the amendment was clearly to bring the statute outside of the decision of the Supreme Court in United States v. Chase, supra.

In the case of Insurance Co. v. Gridley, 100 U. S. 614, 25 L. Ed. 746, an insurance company was defending a loss upon a policy because the insured in his application had made an untruthful answer to a question which would avoid the policy. The application contained the question:

"Have the person's (whose life is to be assured) parents, uncles, aunts, brothers, or sisters been afflicted with consumption, * * * insanity, * * * or any other hereditary disease?"

The applicant answered:

"No; except one brother, temporarily insane six months since. * * * No hereditary taint of any kind in family on either side of the house, to my knowledge."

The company attempted to show at the trial that an uncle had been insane, but failed to prove that the insanity was hereditary. The court held that it was not sufficient to show that an uncle had been insane, but that the company was bound to prove that the insanity was hereditary; in other words, that the words "other hereditary disease" qualified preceding clauses. See Minn. Life Ins. Co. v. Link, 230 Ill. at page 278, 82 N. E. 637.

I cannot agree with the contention of the government that a construction of a highly penal statute which would result in suppressing liquors alleged to be nonintoxicating and harmless should be construed less strictly than an insurance policy.

In Potts v. United States, 114 Fed. 52, 51 C. C. A. 678, the Circuit Court of Appeals of the Ninth Circuit held that the act of Congress relating to public lands, which provided that no person "by any fencing or enclosing, or any other unlawful means, shall prevent, or obstruct * * * any person from peaceably entering upon or establishing a settlement" (Act Feb. 25, 1885, c. 149, 23 Stat. 321), did not prohibit fencing in general, but only unlawful fencing, and reversed the District Court, which had charged the jury that a man had no right to build a fence upon his own land that was so connected with another fence as to form an inclosure of public land. Mercantile Bank v. New York, 121 U. S. 138, 7 Sup. Ct. 826, 30 L. Ed. 895; Pacific Rolling-Mill Co. v. Hamilton (C. C.) 61 Fed. 476.

The decisions of the various courts under liquor statutes are in conflict. In People v. Strickler, 25 Cal. App. 60, 142 Pac. 1121, a statute of the state of California was under consideration which provided that:

"The term 'alcoholic liquors,' * * * shall include spirituous, vinous and malt liquors, and any other liquor or mixture of liquors which contain 1 per cent., by volume, or more, of alcohol * * *." St. 1911, p. 599, § 21.

The Attorney General of California contended that the special language of the statute was not qualified by the general language and that—

"By the specific enumeration in said section of spirituous, vinous and malt liquors, the Legislature intended such liquors to fall under its ban, regardless of whether they do or do not contain alcohol."

The court held that the words "any other liquor or mixture of liquors, which contain 1 per cent., by volume, or more, of alcohol," qualified the preceding words, and that as the liquor in question contained less than 1 per cent. of alcohol it did not come within the prohibition of the statute.

In Ex parte Gray, 83 S. W. 828, the Court of Criminal Appeals of Texas held that the words "spirituous, vinous or malt liquors, or medicated bitters, capable of producing intoxication," meant only

liquors which were in fact intoxicating, and did not include nonintoxicating malt liquors.

In the case of City of Bowling Green v. McMullen, 134 Ky. 742, 122 S. W. 823, 26 L. R. A. (N. S.) 895, the Court of Appeals of Kentucky held that malt liquor containing less than 2 per cent. of alcohol and nonintoxicating was not within the terms "spirituous, vinous, malt or other intoxicating liquors," as used in the statute.

In State v. Virgo, 14 N. D. 293, 103 N. W. 610, it was held that the clause "all spirituous, malt, vinous, fermented or other intoxicating liquors * * * that will produce intoxication" covered only liquors that will actually produce intoxication, and did not include nonintoxicating liquors of any kind.

A decision which was relied upon by the government was United States v. Cohn, 2 Ind. T. 474, 52 S. W. 38. The defendant in that case was indicted for selling in the Indian Territory a malt liquor called "Rochester Tonic." The Act of March 1, 1895, c. 145, 28 Stat. 697 (Comp. St. § 4136b), relating to the Indian Territory, prohibited the selling of "any vinous, malt or fermented liquors, or any other intoxicating drinks of any kind whatsoever." Two out of the three Judges of the territorial court held that Rochester Tonic was within the prohibition of the act, though it was shown not to be intoxicating. A prior statute had prohibited "ale and porter," and the court said:

"By this revision, unless the word 'other' had a different effect in every particular, it enlarged the scope of the old statute, so as to embrace a wider field, both as to persons and the kinds of liquor forbidden."

In State v. Kauffman, 68 Ohio St. 635, 67 N. E. 1062, it was held that a tax laid on "spirituous, vinous, malt or any intoxicating liquors" covered (1) the class of spirituous, vinous, and malt, and (2) the distinct class of "other" intoxicating liquors. The substitution of the word "other" for "any" upon amendment of the law was not regarded in the case of La Follette v. Murray, 81 Ohio St. 480, 91 N. E. 294, as sufficiently significant to change the interpretation which was given in the first case. The court said:

"If the Legislature intended such an important change as the exemption of nonintoxicating vinous and malt liquors from the tax, it would have clearly expressed its intention. * * *"

In State v. Ely, 22 S. D. 487, 118 N. W. 687, 18 Ann. Cas. 92, the words "any spirituous, vinous, malt, brewed, fermented or other intoxicating liquors" were held to amount to a legislative declaration that the liquors of the first class would produce intoxication. It is to be noticed that in this case the words "other intoxicating" are followed by no qualifying adjective, like "malt," which closely binds and relates the word "intoxicating" to the preceding prohibited liquors. The decision also is based in part upon the repeal of a prior statute that held the designated liquors to be intoxicating if they produced intoxication. In Marks v. State, 159 Ala. 71, 48 South. 864, 133 Am. St. Rep. 20, and Fuller v. City of Jackson, 97 Miss. 237, 52 South. 873, 30 L. R. A. (N. S.) 1078, the clauses are not compact, the word "other" is not followed by the qualifying adjective "malt," and it is

less necessary than in the case at bar to relate the qualifying words in respect to intoxication to the preceding words of classification.

In Brown v. State, 17 Ariz. 314, 152 Pac. 578, and Pennell v. State, 141 Wis. 35, 123 N. W. 115, the word "other" is not present.

If the rule of noscitur a sociis is ever to be employed as a canon of construction, it is applicable in the present case, where the close relation of the qualifying word and the compactness of the whole clause render the interpretation I have given almost inevitable. In no clause where the relation of the word "intoxicating" is as close as here, both spacially and grammatically, has a decision been reported prohibiting nonintoxicating malt liquors.

I think it can be fairly said that the general rules of construction enunciated by the United States courts bear out the interpretation of the statute which I have arrived at. The results which the state courts have reached in interpreting their liquor laws have been most divergent, but their decisions furnish abundant authority for the construction I have adopted, and the reasons for it appearing in the act itself seem to me most convincing.

[6] In respect to the question of constitutionality, the only matter before me is whether prohibition of the liquor traffic, including suspension of all brewing, bears any substantial relation to the conduct of the war, either in contributing to the support of armies or to their safe or efficient demobilization. With the wisdom of the measure I have nothing to do. Everything that could be argued in this case was present, even to a stronger degree, in the case of Purity Extract Co. v. Lynch, supra. It is widely believed that prohibition makes for health, strength, and efficiency, physical, mental, and moral. It is also widely believed that prohibition of all malt liquors, regardless of alcoholic content, is necessary for the adequate enforcement of a prohibition law and for suppressing various evils that accompany the saloon. Whether or not this idea is a mistaken one, it would be going much too far to say that there was no substantial or rational relation between these means and the conduct of the war, or the return and demobilization of our armies. I can have no doubt that the construction of the act contended for by the government, if in fact correct, would be within the powers of Congress.

The matter as to which I have had the most serious question is whether suit will lie against the United States attorney, and at the time of the argument I did not think the decisions of the Supreme Court had gone as far as I find, by examination, that they have. It is undoubtedly true that, if chancery can in the protection of business and property determine what beer shall be regarded as intoxicating, a court by means of its injunctive powers may in effect prevent the prosecution for crime of persons who manufacture or sell liquor of an alcoholic content which the court has determined to be nonintoxicating, and may consequently deprive the government of the right to submit to a jury the question whether beer is intoxicating which does not fall within the judicial definition of that term. But some tribunal must render the decision, and it would seem at least to make for uniformity if the standard to be applied is not left to depend upon

the varying verdicts of juries in numberless criminal actions. The method of decision sought to be employed is calculated to render the law certain, and to apprise all persons of their precise rights. It is unnecessary to say that the determination by a court of chancery would deprive no defendant charged with a violation of the statute of a right to have a jury pass on whether the liquor he manufactured or sold was in fact intoxicating. It would only inhibit prosecution in a certain class of cases where the alcoholic content had been decided by the courts to be insufficient to bring the liquor within the provisions of the act. But, whatever may be the advantages or disadvantages of procedure in equity, it appears to be thoroughly authorized under the decisions of Ex parte Young, Truax v. Raich, Wilson v. New, and Hammer v. Dagenhart, supra, because substantial interests of property are involved within the meaning of those decisions, and great multiplicity of action is avoided.

It is unnecessary to say that the question whether beer having 2.75 per cent. of alcohol is intoxicating is not before me for decision. The bill of complaint alleges that such beer is not intoxicating, and the motion by the United States attorney and the acting collector seeks to dismiss it on the ground that, even if this is so, the complainant has no right to restrain these officials from enforcing the act of November 21, 1918, because the complainant is forbidden by the statute to brew any beer, whether intoxicating or not, and because in the case of the United States attorney no suit against him can properly be brought.

For the reasons I have given I am of the opinion that the act only prohibits the manufacture and sale of beer that is in fact intoxicating, and that upon the allegations of the bill both defendants are subject to suit.

The motion to dismiss is therefore denied.